IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No._____

EMPLOYERS MUTUAL CASUALTY COMPANY, an Iowa corporation,

      Plaintiff,

v.

SCHUCHART DOW, INC., a Washington corporation,
SCHOTTEN FENSTER, LLC, a Colorado limited liability company.

      Defendant.

_____

## COMPLAINT FOR DECLARATORY JUDGMENT
_____

Plaintiff, Employers Mutual Casualty Company, by and through its attorneys, Lambdin & Chaney, LLP, for its Complaint for Declaratory Judgment states the following:

## JURISDICTION AND PARTIES

1.     Employers Mutual Casualty Company (hereinafter "EMC") is an Iowa corporation with its principal place of business in Des Moines, Iowa.

2.     Schuchart Dow, Inc. (hereinafter "SDI") is a Washington corporation with its principal place of business in Seattle, Washington.

3.     Schotten Fenster, LLC (hereinafter "Schotten") is a Colorado limited liability company. None of its members are citizens or residents of the State of Iowa.

4.     Plaintiff is of diverse citizenship from both of the Defendants. The matter in controversy exceeds, exclusive of interest and costs, the sum specified in 28 U.S.C. § 1332.

5.      EMC brings this action pursuant to the Declaratory Judgment Act for interpretation of a commercial liability policy and a declaration that EMC does not owe either a defense or indemnification for the claims asserted by John E. and Debbie Bacon against Defendant SDI.

6.      All necessary parties under F.R.C.P. Rule 57 and 28 U.S.C. § 2201 are before the Court.

7.      Venue is this judicial district is proper under 28 U.S.C. § 1391 based on the following:

  a.      The contract of insurance was negotiated and entered into in Colorado;

  b.      The contract of insurance was issued to the named insured in Colorado;

  c.      The contract place of performance was Colorado;

  d.      The named insured is domiciled in Colorado;

  e.      The named insured's principal place of business is Colorado;

  f.       The only rated location on the contract of insurance was Colorado; and

  g.      The State of Washington was neither a rated location nor was the project specifically designated or SDI specifically named as an additional insured.

## THE EMC POLICY

8.      EMC issued commercial liability policy number 3D6-72-69--14 to Schotten, effective 01/07/2013 to 01/07/2014, attached as *Exhibit 1*.

9.      The policy contains a Commercial General Liability Coverage Form, CG 00 01 12 07.

10.     The policy provides in pertinent part as follows:

**SECTION I – COVERAGES, COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.**    **Insuring Agreement**

    **a.**    We will pay those sums that the insured becomes obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.  * * *

    **b.**    This insurance applies to "bodily injury" and "property damage" only if:

        **(1)**    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

        **(2)**    The "bodily injury" or "property damage" occurs during the policy period[.]

**2.**    **Exclusions**

This insurance does not apply to:

**a.**    **Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. . . .

**b.**    **Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of assumption of liability in a contract or agreement.  This exclusion does not apply to liability for damages:

    **(1)**    That the insured would have in the absence of the contract or agreement; or

- 3 -

**(2)**    Assumed in a contract or agreement that is an "insured contract"[.]

. . .

**k.**    **Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l.**    **Damage To Your Work[1]**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

**m.**    **Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)**    A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)**    A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**SECTION V – DEFINITIONS**

**8.**    "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.**    It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.**    You have failed to fulfill the terms of a contract or agreement;

---

[1] As modified by endorsement CG 22 94 10 01 – **EXCLUSION – DAMAGE TO WORK PERFORMED BY SUBCONTRACTORS ON YOUR BEHALF**

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

9.     "Insured contract" means:

*     *     *

f.     That part of any other contract or agreement pertaining to your business . . . under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization.  Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

*     *     *

(2)     That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a)     Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b)     Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3)     Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

13.     "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

- 5 -

**16.**     "Products-completed operations hazard":

    **a.**     Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

        **(1)**     Products that are still in your physical possession; or

        **(2)**     Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

            **(a)**     When all of the work called for in your contract has been completed.

            **(b)**     When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

            **(c)**     When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

        Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

           \*      \*      \*

**17.**     "Property Damage" means:

    **a.**     Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    **b.**     Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

    \*      \*      \*

21. "Your product":

    **a.**    Means:

        **(1)**    Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

            **(a)**    You;

            **(b)**    Others trading under your name; or

            **(c)**    A person or organization whose business or assets you have acquired; and

        **(2)**    Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

    **b.**    Includes

        **(1)**    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product", and

        **(2)**    The providing of or failure to provide warnings or instructions.

    \*    \*    \*

22. "Your work":

    **a.**    Means:

        **(1)**    Work or operations performed by you or on your behalf; and

        **(2)**    Materials, parts or equipment furnished in connection with such work or operations.

    **b.**    Includes

        **(1)**    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

        **(2)**    The providing of or failure to provide warnings or instructions.

11.     The contract of insurance is modified by endorsement CG7482(1-08) –

**BLANKET ADDITIONAL INSURED – CONSTRUCTION CONTRACTS – VICARIOUS**

**LIABILITY** – as follows:

A.     **SECTION II – WHO IS AN INSURED** is amended to include as an additional insured any person or organization for whom you are performing operations when you have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy.  Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole, by:

1.     Your acts or omissions; or

2.     The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured.

A person's or organization's status as an additional insured under this endorsement ends when your operations for that additional insured are completed.

B.     With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to:

1.     "Bodily injury," "property damage" or "personal and advertising injury" resulting from any act or omission by, or willful misconduct of the additional insured, whether the sole or a contributing cause of the loss. The coverage afforded to the additional insured is limited solely to the additional insured's "vicarious liability" that is a specific and direct result of your conduct.

"Vicarious liability" as used in this endorsement means liability that is imposed on the additional insured solely by virtue of its relationship with you, and not due to any act or omission of the additional insured.

2.     "Bodily injury" or "property damage" occurring after:

- 8 -

    **a.**    All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

    **b.**    That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

**3.**    "Bodily injury," "property damage" or "personal and advertising injury" arising out of the rendering of, or failure to render, any professional, architectural, engineering or surveying services including:

    **a.**    The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

    **b.**    Supervisory, inspection, architectural or engineering activities.

**C.**    The limits of insurance applicable to the additional insured are those specified in the Declarations of this policy or in the written contract or written agreement, whichever is lower.

**D.**    Any coverage provided hereunder shall be excess over any other valid and collectible insurance available to the additional insured whether that insurance is primary excess, contingent or on any other basis, unless you and the additional insured have specifically agreed in a written contract or written agreement that this insurance be primary.

    When coverage is provided on a primary basis we will not seek contribution from any other insurance available to the additional insured if a written contract or written agreement requires that this insurance be noncontributory.

**E.**    All other terms and conditions of this policy remain unchanged.

## THE UNDERLYING COMPLAINT

12.     This matter arises out of the construction of a private residence located at 8925 Groat Point Drive, Medina, Washington.

13.     The homeowners John E. and Debbie Bacon (the "Homeowners") entered into a construction contract with general contractor Defendant SDI on or about May 5, 2013.

14.     Work on the Project began in the Spring of 2013, and Substantial Completion was to be achieved within 807 days of commencement.

15.     Defendant SDI and Defendant Schotten entered into a Master Subcontract Agreement on January 21, 2014.

16.     Defendant SDI and Defendant Schotten entered into a Purchase Order agreement on January 21, 2014, which provided that Schotten would commence the Work on or before 1/17/2014.

17.     On May 11, 2017, the Homeowners filed a Complaint and Arbitration Demand against SDI (referred to as the "Underlying Complaint" attached as **Exhibit 2**) alleging *inter alia* the following:

### IV.     SELECTION OF DOOR AND WINDOW MANUFACTURER

9.     By September 2013, SDI had identified three potential window and door manufacturers: Schotten Fenster, Point 5 and Pacific Rim (Albertini).

10.     SDI was to compare the three companies and make a recommendation to Owners.

11.     On November 20, 2013, SDI presented a subcontractor bid analysis of the three companies.  The bid analysis chart prepared by SDI states that Schotten Fenster products are National Fenestration Rating Council (NFRC) Certified, that the frames would be aluminum clad in dark bronze tint, that the products would have weep holes and other relevant criteria.

3    12.    During this November 20, 2013 meeting, SDI and the Owners discussed warranty

4    durations. SDI notified Owners that Schotten Fenster's warranty was 10 years for the glass, 10

5    years for the wood and 20 years for the aluminum cladding.

6    13.    SDI recommended hiring Schotten Fenster.

7    14.    Based on various factors, including its ability to meet NFRC testing criteria

8    required in Washington State and SDI's recommendation Schotten Fenster was selected to

9    fabricate and install the Doors and Windows on the residence.

10    15.    The mockup from Schotten Fenster used in this selection process remained in the

11    custody of SDI and, according to SDI, has now been misplaced or discarded.

12    16.    The term Doors as used in this Complaint refers to the composite assembly of all

13    components supplied or installed by SDI and/or subcontractors, including the motorized

14    openings in the kitchen (G-1), the family room (G-2 and G-3), the great room (G-4), the bar (G-

15    5), and the master bedroom (G-6). In total, the G-1 through G-6 motorized openings have 17

16    panels. The Doors were designed and built in such a fashion that when one or more components

17    physically failed, the entire assembly (consisting of the work or product of multiple

18    subcontractors) was physically damaged.

19    17.    The term Windows as used in the Complaint is the composite assembly of all

20    components supplied or installed by SDI and/or its subcontractors, including all fixed window

21    composite assemblies located throughout the residence. There are a total of 76 Windows at issue

22    in this Complaint. The Windows were designed and built in such a fashion that when one or

23    more components physically failed, the entire assembly (consisting of the work or product of

24    multiple contractors) was physically damaged.

25    18.    On or about January 21, 2014, SDI entered into a Purchase Order with Schotten

26    Fenster in the fixed sum of $1,114,328.00. Among other things, the Purchase Order required

27    Schotten Fenster to comply with the following specification requirements:

- 11 -

**V.    SCHOTTEN FENSTER DEFAULT**

19.    SDI asked Brian Ludington, a general contractor located in Palm Springs who has built homes designed by KHA, for his opinion about Schotten Fenster.

20.    Brian Ludington informed SDI at that time not to use Schotten Fenster because of recent problems Brian had experienced with Schotten Fenster on a number of projects.

21.    SDI did not notify the Owners of Brian Ludington's concern at the time.

22.    Chesmore and the Bacons only found out about this warning from Brian Ludington in after Schotten Fenster went out of business (as described below).

23.    During a site visit in the first part of May 2014, Chesmore asked SDI's Jim Bickford how the Schotten Fenster work was going.

24.    Bickford notified Chesmore that SDI was having challenges with Schotten Fenster (*i.e.*, late shop drawings, noncommittal delivery dates).

25.    At a meeting on May 21, 2014, SDI disclosed to the Owners that the Door and Window package from Schotten Fenster was a serious problem. Mike Griffith for the Owners asked SDI's Bickford to visit Schotten Fenster to explore the level of risk.

26.    At a meeting on August 7, 2014, SDI disclosed that Schotten Fenster was going bankrupt.

27.    Between January 2014 and July 2014, in spite of knowledge of Schotten Fenster's problems, SDI made seven payments to Schotten Fenster totaling $506,755.45. This included a payment dated June 12, 2014 in the amount of $165,984.31 and a payment dated July 15, 2014 in the amount of $128,150.50, well after SDI was aware of Schotten Fenster's performance problems.

28.    The Owners paid the full $506,755.45 to SDI, plus markup at 9% and all applicable WSST. SDI also billed the Owners for SDI's legal fees to investigate the collapse of Schotten Fenster and Owners paid that billing too. The Owners received no value for these payments. Schotten Fenster went out of business and provided no Doors nor Windows to the Project. Consequently, the deposits paid to Schotten Fenster were lost. SDI is indebted to the Owners for all costs associated with the lost deposits.

14

## VI.    SDI AGREES TO FABRICATE

15    29.    To replace Schotten Fenster on the Project, SDI agreed to assume responsibility

16    for arranging to have subcontractors and vendors fabricate the Doors and Windows to meet

17    Schotten Fenster's requirements.

18    30.    This decision was made at a meeting on August 22, 2014 attended by SDI, KHA

19    and the Owners. The purpose of the meeting was to decide how to proceed with the fabrication

20    and installation of the Doors and Windows following Schotten Fenster's default, which resulted

21    in the loss of nine months of effort with Schotten Fenster.

## VII.    SDI USED 12 OR MORE SEPARATE VENDORS / SUBCONTRACTORS

45.    In late August 2014, SDI began to attempt to facilitate the provision of the Doors and Windows.

46.    Based on information and belief, SDI had never built or facilitated the fabrication any such doors or windows and had no NFRC certification to do so.  SDI's failure to disclose this fact had the capacity to deceive.

47.    The Contract required SDI to provide Windows and Door to meet applicable codes including the Washington Energy Code. *See, e.g.,* General Conditions § 3.7.2.  The Contract incorporated Section R308 of the 2009 International Residential Code and made it applicable to all glazing.

48.    Whereas Schotten Fenster was a single point of responsibility for fabrication of the Doors and Windows under controlled conditions at a certified facility, the process SDI developed involved a disparate and disjointed array of at least 12 separate companies located in at least 4 states that had to be coordinated by SDI in order to attain the specified requirements for these complex, high performance products:

a. SDI used at least five different companies as subcontractors/vendors to build the frames for the Doors and Windows under SDI's putative supervision (New Horizon, Cascade Woodwork, Advantage Architectural, O.B. Williams, Seattle Stairs).

b. SDI used a separate company (Clearly Dynamic) to fabricate the glass for the Windows.

c. SDI used a separate company (KLM Custom Sash) to fabricate the frames for the Doors.

d. SDI used a separate company (Prime Contracting) to install the glass in the frames for the Windows.

e. SDI used a separate company (Town & Country) to install the Doors.

f. SDI used a separate company (Woods Welders) to install the cladding on the Windows.

g. SDI used a separate company (Doors In Motion) to install the motors to operate the Doors.

h. SDI used a separate company (California Bent Glass) to fabricate and deliver the glass panels for the Doors.

## IX.  SDI ABANDONS THE PROJECT

60.     On November 21, 2015, SDI sent the Owners a notice of intent to stop work after November 28, 2015, citing the withholding of $650,000 retention ($800,000 retention, less $150,000 deposit) after Substantial Completion and nonpayment of SDI's October Pay Application dated October 30, 2015.

61.     The Owners properly withheld these funds due to SDI's non-compliant and/or defective work and other proper grounds identified in the Contract.

## X.    DOOR DAMAGE

65.    The Doors were fabricated and installed improperly, do not operate properly, have undergone significant physical damage subsequent to substantial completion, cannot be repaired in situ and must be replaced.

66.    The Door damage is due to a combination of material breaches, including without limitation warpage, bowed glass, lack of safety sensors, out of tolerance installation, lack of NFRC certification and cracked panels.

67.    The Doors leak and water damage to the home has occurred.

68.    The Owners provided SDI with numerous notices and opportunity to repair and/or replace the Doors at its cost in accordance with its obligations.

69.    SDI refused to repair and/or replace the Doors at its expense in violation of its obligations.

70.    SDI is in breach of the warranty obligations it assumed by assuming the role occupied by Schotten Fenster, *i.e.,* 20 years glass, 10 years all else.

71.    SDI applied for and obtained the Temporary Certificate of Occupancy from the City of Medina under false pretenses by not notifying the City of the fact that the Doors and Windows were not fabricated by an NFRC certified vendors (Schotten Fenster). At a minimum, this had the capacity to deceive.

## XI.    WINDOW / CLADDING DAMAGE

72.    In late February 2016, the Owners noticed water pooling on the inside sash of Windows in the upstairs hallway. This damage occurred to portions of the home upon which neither SDI nor its subcontractors were then performing operations. Alternatively, the water intrusion damage did not arise out of the operations SDI was then performing on other particular parts of the home.

73.    On March 1, 2016, the Owners notified SDI of this water intrusion and requested that SDI, at its cost, investigate the cause of the water intrusion and propose mitigation and repair plan.

## XIII.    CLAIMS AGAINST SDI

107.    The Doors and Windows are damaged/defective, have caused damage to other building components and finishes, have caused damage to the Residence, and have forced the Owners to incur significant investigation and repair costs. As a result of damaged/defective work and failure to honor Contract requirements, the Owners bring claims against SDI for (1) Breach of Contract, (2) Breach of Contractual Warranty, (3) Code Violations (4) Breach of Implied Duty of Good Faith and (5) Violation of the Consumer Protection Act.

108.    The Owners' claims originate from six issues related to the Project, as further detailed below.

### Issue 1: Door Failure (G-1 through G-6)

109.    The Owners have paid SDI for Doors that suffer from significant damage and/or defects and that have, or will, continue to damage other building components. As detailed by the Owners' experts, the doors do not cycle fully, they rub on one another, are not water tight, the bottom roller slide tracks are out of alignment, the glazing is not weather sealed, the safety sensors not installed / working, and SDI's installation was out of tolerance.

110.    Additionally, glass panels in the Doors have spontaneously cracked.

111.    SDI is responsible for all costs of damaged/defective or non-conforming work.

112.    Additionally, contrary to SDI's representations when SDI assumed responsibility for management of Schotten Fenster's scope of work, SDI has never provided the Owners with evidence that the Doors have been tested and shown to comply with NFRC requirements, Washington State Energy Code U-Value requirements, IRC requirements, and any other applicable laws or codes. This is contrary to the Contracts:

> Tests, inspections and approvals of portions of the Work shall be made as required by the Contract Documents and by applicable laws, statutes, ordinances, codes, rules and regulations or lawful orders of public authorities. Unless otherwise provided, the Contractor shall make arrangements for such tests, inspection and approvals with an independent testing laboratory or entity acceptable to the Owner, or with the appropriate public authority, and shall bear all related costs of tests, inspections and approvals.

(A201 § 13.5.1, A201 § 13.5.3 all costs associated with failure of the work to comply with contract requirements shall be at the SDI's expense).

**Issue 2: Window / Cladding Failures**

118.    The Windows are damaged, defective and nonconforming. The damage occurred in whole or in part after various component subcontractors had completed their work, and after SDI abandoned its own work.

119.    Such damage, defects and non-conformities include without limitation lack of NFRC certification, leakage, water penetration, air infiltration, improper cladding, incorrect glass, lack of compliance with applicable laws, ordinances and/or codes.

**Issue 3:  Schotten Fenster Deposit**

128.    SDI did not properly manage the supply contract relationship with Schotten Fenster, Schotten Fenster defaulted on its obligations, and the Owners' $506,000 deposit was lost.

129.    Article 7 of A103, "Costs to be Reimbursed" states: "Deposits lost for causes other than the Contractor's negligence or failure to fulfill a specific responsibility in the Contract Documents." A103, §7.6.7.

130.    The deposits were lost due to SDI's negligence and / or failure to fulfill its specific responsibility to manage the supply contract relationship with Schotten Fenster.

131.    In addition, SDI charged the Owners a 9% markup on the lost deposits, assessed and collected WSST on the lost deposits and charged Owners over $15,000 in legal fees to examine remedies against Schotten Fenster.

132.    As a result, SDI must bear this loss, plus associated SDI markup (9%), applicable WSST and improperly charged legal fees.

**Issue 4:  Investigation Costs**

133.    SDI failed to comply with its obligations to develop conclusions and correct defective work following notice by the Owners. *See, e.g.,* A201 §12.2.

134.    As a result, the Owners were forced to retain various experts to determine the root cause of the defects and deficiencies in the Windows, Doors and window cladding, as necessary to remediate SDI's damaged and defective work.

**Issue 5: Cost Issues**

138.    On numerous occasions over the course of the Project, the Owners, KHA and Chesmore all expressed concern regarding the exorbitant costs SDI was charging for labor and materials, the overall lack of cost controls, and the amounts SDI was asking the Owners to pay manufacturers up front, long before any product was on site.

139.    The nature of a time and materials contract mandates that contractors who perform this type of work are charged with special duties, including a duty to avoid costs associated with inefficiency, to work economically and in the owner's best interest, to avoid the cost of remedial work due to poor workmanship, and to reasonably control costs as if the project were for a lump sum.

**Issue 6: Consumer Protection Act**

144.    SDI concealed information regarding damaged and defective work from the Owners.

145.    SDI had knowledge of this damaged and defective work and concealed this knowledge from the Owners.

## XIV.    RELIEF SOUGHT

150.    Based on the foregoing, the Owners seek entry of a monetary award in their favor and against Respondent SDI in an amount to be proven at the hearing not less than $5,500,000, plus legal costs and costs as allowed by Contract, law or equity, prejudgment interest and such other relief as may be just.

## TENDER OF DEFENSE AND INDEMNITY

18.    Defendant SDI tendered its defense and indemnification to Plaintiff EMC under the contract of insurance issued to Defendant Schotten.

19.    EMC denied the tender, fully reserving all rights under the policy.

20.    While not intending to be a full recitation of all the issues precluding coverage, in summary, the EMC policy expired prior to its named insured entering into the Master Subcontract

with Defendant SDI and prior to the issuance of the Purchase Order. As alleged by the Homeowners, Defendant Schotten did not provide any doors or windows to the project. Instead, after Schotten's default, SDI contracted with 12 or more separate vendors and subcontractors to fabricate the contractually required doors and windows. All of the Homeowners' claimed property damage occurred as a result of the windows and doors fabricated by these separate vendors and subcontractors well after the expiration of EMC's policy issued to Schotten, which coverage would nevertheless be precluded by a number of policy exclusions.

21.    Moreover, the blanket additional insured endorsement does not provide coverage to SDI for a number of reasons, including that there was no property damage caused in whole by Schotten's acts or omissions in performance of its ongoing operations pursuant to a written agreement with SDI within EMC's policy period; SDI's liability is not limited solely to its vicarious liability for Schotten; and there is no coverage for the rendering of, or failure to render any professional service, including preparing, approving, or failing to prepare or approve drawings and specifications.

22.    Defendant SDI continues to demand coverage and has repeatedly accused EMC of bad faith.

23.    Accordingly, EMC is seeking a judicial declaration of its obligations under the contract of insurance.

## FIRST CLAIM FOR RELIEF

24.     Plaintiff seeks declaratory judgment, pursuant to the Federal Declaratory Judgments Law, 28 U.S.C. § 2201 *et seq.* and F.R.C.P. 57, that there is no coverage for the Underlying Complaint, including but not limited to:

    a.     The insuring agreement has not been triggered in that there has not been property damage caused by an occurrence prior to the expiration of EMC's policy on January 7, 2014;

    b.     Assuming *arguendo* the insuring agreement was triggered, one or more of the exclusions preclude coverage;

    c.     The blanket additional insured endorsement does not provide coverage to Defendant SDI.

25     In requesting this declaratory relief, Plaintiff is requesting an interpretation of the rights, legal status and relationships of the parties under the above law and facts.

26.     Such interpretation is appropriate under the provisions of the Federal Declaratory Judgments Law, 28 U.S.C. § 2201 *et seq.* and F.R.C.P. 57.

WHEREFORE, Plaintiff requests that the Court determine the rights, status or other legal relations of the parties under the above law and facts, and for all other relief to which Plaintiff may be entitled, including costs, expenses, attorney fees and pre- and post-judgment interest as may be permitted by law.

PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

DATED this 19th day of June, 2017.

Respectfully submitted,

LAMBDIN & CHANEY, LLP


By: _s/ L. Kathleen Chaney_____
L. Kathleen Chaney, Esq.
4949 S. Syracuse Street, Suite 600
Denver, Colorado 80237
Telephone:      (303) 799-8889
Facsimile:      (303) 799-3700
Email:          kchaney@lclaw.net

*Attorneys for Plaintiff EMC*